**Barletto v. Heuschkel**

*Robert O. Lampl, Esie R. Lampl,* and *James R. Cooney,* for plaintiff.

*Mark A. Willard, Stuart Kaplan,* and *Audrey K. Kwak,* for defendants.

MOTTO, *P.J.,* February 7, 2011—Before the court for disposition are preliminary objections filed on behalf of defendants Mark Heuschkel ("Heuschkel"), Ferrotech Corporation ("Ferrotech"), Ferromet Corporation ("Ferromet"), and Ferrotech Realty, LLC ("Ferrotech Realty") in response to the complaint of plaintiff Charles Barletto ("Barletto"). Defendants contend that the asset purchase agreement ("APA") at the heart of this dispute contains a broad arbitration clause which compels any and all disputes arising out of the APA be resolved through arbitration. Plaintiff argues that because three of the four defendants are non-signatories to the agreement, arbitration is not the proper venue for disposition of his claims and the court must hear the matter. After argument on the preliminary objections and reviewing applicable case

law and the well-argued briefs submitted by the parties, the court sustains defendants' preliminary objections for dismissal based on jurisdictional grounds.

The plaintiff in the action before the court today is Charles Barletto, a self-averred "experienced businessman" who ran a number of scrap metal processing enterprises. The primary defendant, Mark Heuschkel, was also involved in the scrap metal processing business and was a customer of Barletto's. Barletto owned three separate businesses associated with the scrap metal industry, those being Barletto Equipment and Construction Company, Industrial Concerns, and Barletto Corporation. Defendant Heuschkel's business, known as Ferromet, also a defendant in the present action, sent much of its scrap steel to Barletto Corporation to be processed.

In 2005, Barletto and Heuschkel entered into negotiations for the sale of Barletto Corporation and Barletto Equipment, and for a lease on the property owned by industrial concerns to a new company Heuschkel had founded, Ferrotech, which is also a defendant in the current action. The heart of the dispute between the parties rests on the rights and obligations contained within the APA that effectuated the sale. Under the agreement, Ferrotech agreed to employ Barletto as a consultant and to provide Barletto with twenty-five percent of the voting stock of Ferrotech. In order for Barletto to receive his twenty-five percent of the shares, there were several obligations he had to satisfy. The obligations included delivery of the fully executed sublease to the property owned by industrial concerns, the transfer of a dust collection permit, the attachment of the seller's financial statements to the agreement, the full

release of any and all claims and/or liens on the purchased assets, and a receipt of revenue notice.

After the execution of the APA, Ferrotech became a highly profitable business. Barletto believes that as an alleged minority shareholder he was entitled to share in the profits. Barletto avers that Heuschkel informed him he was not entitled to share in the profits, and that Heuschkel routinely refused to allow Barletto any share of the profits earned by Ferrotech. Barletto alleges in his complaint that Heuschkel, in an attempt to keep the profits from Barletto, funneled the profits to Ferromet, the parent corporation of Ferrotech.

In 2008, it became necessary for the parties to refinance the mortgage on the facility Ferrotech leased from Industrial Concerns Inc. In order to receive the refinancing, Heuschkel informed Barletto that the property owned by Industrial Concerns would have to be deeded over to Ferrotech. On June 24, 2009 the parties executed the document that Barletto believed would deed the property from Industrial Concerns to Ferrotech. In actuality, the document deeded the property from Industrial Concerns to Ferrotech Realty, another new corporation formed by Heuschkel and the final defendant in the current action.

Barletto alleges in his complaint that his signature on the 2009 agreement was procured through means of duress and fraud. Specifically Barletto alleges that when he was told he had to sign the document, he was unaware that the document was an agreement between the parties, and that when he asked to review the document Heuschkel refused to allow him and threatened Barletto with termination if

he did not sign.

Plaintiff alleges that he only signed the 2009 agreement and deeded over the property owned by Industrial Concerns after he was given assurances by Heuschkel that he would still own twenty-five percent of the property as he was the owner of twenty-five percent of the stock of Ferrotech. Defendant Heuschkel avers that because plaintiff failed to fulfill his obligations under the original APA, plaintiff never became a minority stockholder in Ferrotech.

In October of 2009 the business relationship between Barletto and Heuschkel ended. On or about October 30, Barletto was in the offices of Ferrotech and a confrontation between himself and Heuschkel occurred. As a result of the confrontation, Barletto was fired from the employ of Ferrotech. Upon his termination, Barletto inquired into his position as minority shareholder in Ferrotech. Barletto alleges that he was informed his stock was worthless and all of the assets of Ferrotech were owned by Ferromet or Ferrotech Realty. Barletto was then frozen out of the business and corporate affairs of Ferrotech, which Barletto believes deprived him of his rights as a shareholder.

As a result of his termination from Ferrotech, Barletto started a new business. Since the start of his new business, Barletto alleges that Heuschkel has engaged in a campaign of defamation, trade libel, and interference with contractual relations. Barletto alleges that Heuschkel has contacted customers and potential customers of Barletto's and informed them that Barletto is a "crack addict", sleeps with "crack whores," is not fit to be in business, is unreliable, and is a "liar" and "thief" who cannot be trusted. Barletto

claims that these statements allegedly made by Heuschkel have had a "serious and deleterious impact" upon his new business. Based on the above mentioned facts, Barletto has instituted the current action before the court today.

Pursuant to Pa.R.C.P. § 1028(a)(6), a party may raise by preliminary objections an agreement for alternative dispute resolution. A court is required to sustain preliminary objections raising an agreement for alternative dispute resolution, if the court finds as a matter of law that the dispute falls within the ambit of a contractual arbitration provision. *Shadduck v. Christopher J. Kaclick, Inc.*, 713 A.2d 635, 639 (Pa. Super. 1998).

In filing his complaint before the court, plaintiff attempts to avoid the arbitration clause contained within the APA. Plaintiff initially alleged that he was not a signatory to the agreement and therefore could not be compelled to arbitrate. Careful examination of the agreement, however, reveals that plaintiff is a signatory to the agreement. Barletto is directly listed as a party to the agreement, rights and obligations of Barletto are found throughout the agreement, and on the signature page Barletto signed as an individual party to the agreement. The record clearly establishes that Barletto is a signatory and party to the APA.

The arbitration clause contained within the agreement states that "any and all disputes, controversies, or claims arising out of or relating to this agreement or for the breach or validity of any term or provision of this agreement, shall be resolved by final and binding arbitration." Pennsylvania appellate case law considering

similarly worded clauses have held that such clauses are unlimited arbitration clauses and any claims implicating the contract can be compelled to arbitration. *Dodds v. Pulte Home Corporation*, 909 A.2d 348, 351 (Pa. Super. 2006) (artitration clause that read "Any controversy, claim, or dispute arising out of or relating to this agreement" compels arbitration of fraud claims); *Smay v. Stuebner, Inc.*, 864 A.2d 1266, 1276 (Pa. Super. 2004) (arbitration clause that read "Any controversy or Claim arising out of or related to the contract," interpreted broadly to include all claims arising from the contract regardless of whether the claim sounds in tort or contract). The arbitration clause at issue before the court is equally as broad as those found in *Dodds* and *Smay* and thus any disputes arising out of or relating to the APA or the validity or breaches of contractual obligations and duties contained therein may be compelled to arbitration. An examination of the nine counts of plaintiff's complaint reveals that all counts arise out of or relate back to the APA or its breach.

Count one of the complaint is against defendant Heuschkel for breach of contract. Plaintiff alleges that various actions committed by Heuschkel constitute repeated breaches of the APA. Plaintiff avers that the first alleged breach occurred when Heuschkel refused to recognize the twenty-five percent interest in Ferrotech that Barletto believed he was entitled to under the agreement. The second alleged breach occurred when Barletto was terminated from Ferrotech despite the twenty-five percent interest he believed he held in the company. Plaintiff claims the third breach came as a result of Heuschkel's failure to share the profits earned by Ferrotech with Barletto since

the date of the agreement. The final alleged breach is for the deprivation of salary and benefits Barletto felt he was entitled to receive under the "consulting agreement" agreed upon by the parties when signing the agreement. All of the claims in count one of the complaint arise out of the terms of the APA and the alleged breach of those terms.

In count two of the complaint, Barletto alleges that Heuschkel breached the fiduciary duty owed to Barletto as a minority shareholder. Plaintiff claims that Heuschkel, as a majority shareholder, owed plaintiff a fiduciary duty to not exclude plaintiff from his "proper share of benefits accruing from the enterprise." Plaintiff alleges that Heuschkel breached his fiduciary duty by refusing to allow Barletto to participate in the profits earned by Ferrotech and for terminating Barletto despite his holding a twenty-five percent interest in the company. The alleged breach of fiduciary duty by Heuschkel arises directly out of the obligations of the parties found within the APA.

Count three of the complaint is against defendant Heuschkel for alleged corporate oppression of a minority shareholder. This court also arises directly out of the terms of the original APA. Barletto bases this count of the complaint on 15 Pa.C.S. 1767(a)(2) and avers that the breach of fiduciary duty by Heuschkel alleged in count two also constitutes corporate oppression of a minority shareholder.

In count four of the complaint, plaintiff brings claims against Heuschkel, Ferrotech, and Ferromet for fraud. Barletto alleges that the promise by Heuschkel of a

twenty-five percent interest in Ferrotech was a significant inducement for Barletto in signing the APA. Plaintiff alleges further that Heuschkel's representations that Ferrotech would earn substantial profits that would be split between Heuschkel and plaintiff was additional inducement for plaintiff's entering into the APA. In his complaint, plaintiff avers that Ferrotech did indeed earn substantial profits, but plaintiff was excluded in the sharing of the profits as a result of Heuschkel's funneling the profits made by Ferrotech into Ferromet for the purpose of preventing plaintiff from receiving his rightful share of the profits. This count arises directly out of alleged violations of the duties and obligations contained within the APA.

The fifth count of plaintiff's complaint is for an accounting of the profits earned by Ferrotech. This count is against defendants Heuschkel, Ferrotech, and Ferromet and also arises directly from rights and obligations of the parties found within the APA. Plaintiff asserts that as a result of the alleged fraud perpetrated by the defendants in the previous count, he is entitled to an accounting of all the profits earned by Ferrotech from the date of the APA until the present date, as well as accountings of any transfers Ferrotech may have made to Ferromet The sixth and seventh counts of plaintiff's complaint are for fraud against defendants Heuschkel and Ferrotech Realty, LLC and for rescission against the same. These counts of the complaint arise directly from the lease agreement contained in the APA. Plaintiff alleges that he was fraudulently induced to deed the property owned by industrial concerns to Ferrotech Realty when the parties refinanced the property in 2008.

The eighth and ninth counts of the complaint are against defendant Heuschkel for defamation/trade libel and intentional interference with contractual relations. These counts originated with Heuschkel's alleged breach of the APA forcing Barletto to start a new business. Barletto alleges that since he started his new business, Heuschkel has participated in a campaign of defamation and trade libel against him. Plaintiff alleges that this campaign has intentionally interfered with his current and potential customers.

In the nine counts filed by plaintiff, multiple defendants have been named. Defendant Heuschkel has been named individually as defendant in each count. At counts four and five, Ferromet and Ferrotech have also been included as defendants, and at counts six and seven, Ferrotech Realty is included as a defendant. While four separate parties are involved as defendants in the complaint, the close relationship between the four parties renders their individual interests intricately linked.

Of the four defendants, only Ferrotech is a signatory to the APA, and based on this fact Barletto avers that he cannot be compelled to arbitration. Pennsylvania case law, however, supports the notion that non-signatory agents, parent corporations, or sister corporations may enforce arbitration clauses when the interests of the parties overlap or are closely linked. *Dodds v. Pulte Home Corporation,* 909 A.2d 348, 351-352 (Pa. Super. 2006). Defendant Heuschkel is the president and owner of Ferrotech, and as such he is the agent through which Ferrotech, a corporation and creature of legal fiction, must

act. Ferromet is the parent company of both Ferrotech and Ferrotech Realty. Defendant Heuschkel is the owner of all three corporate defendants, and all of the charges against the corporate defendants stem directly from Heuschkel's conduct as the owner and president of the corporations. For the reasons that follow this court finds that plaintiff Barletto is compelled to arbitrate all his claims at the insistence of the non-signatory defendants.

Arbitration is contractual by nature and it is well established that absent an agreement between the parties to arbitrate an issue, they cannot be compelled to arbitrate. *Hoffman v. Gekoski*, 378 A.2d 447 (Pa. Super. 1977). As a matter of public policy, courts of the commonwealth favor agreements to arbitrate and such agreements will be found valid, enforceable and irrevocable save for grounds that exist at law or in equity that relate to the validity, enforceability, or revocation of any contract. *Quiles v. Financial Exchange*, 879 A.2d 281, 287 (Pa. Super. 2005), quoting *Keystone Tech. Group, Inc. v. Kerr Group, Inc.*, 824 A.2d 1223 (Pa. Super. 2003) and *Emmaus Municipal Auth. v. Eltz*, 416 Pa. 123, 204 A.2d 926 (1964). When a party to an agreement is attempting to prevent another from proceeding to arbitration, the court must apply a two-part test. The court must first determine whether a valid agreement to arbitrate exists between the parties, and if so, determine whether the dispute involved is within the scope of the arbitration provision. *Highmark, Inc. v. Hospital Service Association of Northeastern Pennsylvania*, 785 A.2d 93, 98 (Pa. Super. 2001).

The first step the court must take is to determine

whether a valid arbitration clause exists. There can be little doubt that a valid agreement exists between Barletto and Ferrotech. The parties to the APA are listed on the first page of the agreement as Charles Barletto, Barletto Corporation, Barletto Equipment and Construction Co., Industrial Concerns, and Ferrotech Corporation. On the signature page of the agreement, the same page on which the arbitration clause is found, both Ferrotech and Charles Barletto, as an individual, are signatories. The validity issue the court must resolve is whether the non-signatory defendants, Heuschkel, Ferromet, and Ferrotech Realty, may enforce the arbitration clause for the claims brought against them by Barletto.

When confronted with the question before the court today, Pennsylvania courts and federal district courts have relied upon traditional principles of contract and agency law. See *Dodds v. Pulte Home Corporation*, 909 A.2d 348 (Pa. Super. 2006) (allowing parent corporation to invoke arbitration clause signed by subsidiary based on obvious and close nexus between contract and non-signatory); *Smay v. E.R. Stuebner, Inc.*, 864 A.2d 1266 (Pa. Super. 2004) (third-party beneficiary bound by arbitration clause); *Pritzker v. Merrill Lynch, Pierce, Fenner, & smith, Inc.*, 7 F.3d 1110 (3rd Cir. 1993) (agent of signatory bound by arbitration clause). In *Thomson-CSF v. American Arbitration Association*, 64 F.3d 773 (2nd Cir. 1995), the second circuit discussed five traditional theories arising out of common law principles of contract and agency that can bind non-signatories to arbitration agreements. The theories identified by the court were: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/

alter ego; and 5) equitable estoppel. *Thomson-CSF* at 776. This court holds that Barletto is bound to arbitrate by the contract theories associated with agency, the parent-subsidiary relationship, and equitable estoppel.

Particularly important to the question sub judice is the principle that non-signatories can enforce an arbitration agreement where there is an obvious and close nexus between the non-signatories and the contract or contracting parties. *Weiner v. Pritzker,* Nos. 2846, 1011251, 2001 WL 1807929 citing *Dayoff Inc. v. H.J. Heinz Inc.,* 86 F.3d 1287 (3rd Cir. 1996). One instance in which such an obvious and close nexus exists is the relationship between a principal and an agent. *Weiner* at 2. Under traditional agency theory, an agent is subject to contractual provisions entered into by the principal. Therefore, because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements. *Pritzker v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.,* 7 F.3d 1110, 1121 (3rd Cir. 1993).

In the commonwealth, agency is defined as the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act. Restatement (Second) of Agency § 1. The relationship necessary to create an agency does not depend on the intent of the parties to create it, nor their belief that they have done so. What is necessary to create the relation is an agreement between the parties, which need not be contractual, that results in the factual

relation to which the legal consequences of an agency are attached. This is the case even if the parties did not call the relationship an agency or did not intend for an agency to exist. Restatement (Second) of Agency § 1 comment b.

With these principles of agency in mind, there can be no doubt that defendant Heuschkel was acting as an agent of Ferromet Ferrotech, and Ferrotech Realty when he allegedly breached the APA. As president and sole-owner of the three corporate defendants, Heuschkel was the means through which the corporate entities acted. In *Weiner v. Pritzker*, the plaintiff attempted to avoid the arbitration agreement by suing two employees of the principal with which he had signed the agreement. *Weiner*, 2001 WL 1807929 at 2. Like Heuschkel, *Pritzker* was the president and active controlling shareholder for the principal company, Omicron. *Id.* at 2. The court recognized that this relationship created the factual relation necessary for an agency to be found at law, and likewise an agency relationship exists in the case sub judice. *Id.* Heuschkel, as the president and controlling shareholder of Ferrotech, is the agent of Ferrotech, the signatory to the APA, and as such he may enforce the arbitration clause found within the APA for claims against him that arise out of or relate to the agreement.

Having established that the arbitration clause is valid as to Heuschkel for the actions he took as the agent of Ferrotech, the court now must determine if the clause is valid as to Ferrotech Realty, the sister corporation of Ferrotech. In *Pritzker v. Merrill Lynch, Pierce, Fenner, & smith*, 7 F.3d 1110 (3rd Cir. 1993), the Third Circuit

found that the non-signatory corporate sister of Merril Lynch, Pierce, Fenner, & Smith ("MLPFS") could enforce an arbitration clause to which MLPFS was the signatory. The holding in *Pritzker* was based on the principle that arbitration agreements may be upheld against non-signatories where their interests are directly related to, if not congruent with a signatory. *Pritzker* at 1122.

In reaching its holding, the court focused on the fact that Merril Lynch Asset Management, Inc. ("MLAM"), as a sister corporation to MLPFS, held interests that were directly related to those of MLPFS. *Id.* at 1122. The issue in *Pritzker* centered on investment purchases the plaintiffs believed were in violation of the fiduciary duties owed them through the cash management agreements they had with MLPFS. *Id.* at 1113. The cash management agreements contained clauses that designated arbitration as the forum to resolve any controversies arising between MLPFS and the plaintiffs. *Id.* The plaintiffs filed three claims, one of which was against MLAM for participation in the knowing breach of fiduciary duties owed to the plaintiffs through the agreements. *Id.*

In holding that MLAM could compel arbitration, the court relied on the plaintiffs' own theory of liability to find that the interests of MLAM were directly related to, and potentially predicated upon the actions of MPFS, who was a signatory to the agreement. *Id.* at 1122. The court found this to be determinative in holding that MLAM had interests congruent with its sister corporation. *Id.* The court ruled that where parties unmistakably intend to arbitrate all controversies which might arise between them, their

agreement should be applied to claims against agents or entities related to the signatories. *Id.*

The same principles relied upon by the Third Circuit are equally applicable to Ferrotech Realty. Barletto alleges that in early 2008 the parties needed to refinance the mortgage on the property leased to Ferrotech by Industrial Concerns through the APA. Barletto claims that Heuschkel, acting as agent of Ferrotech, informed him that to receive the financing the property needed to be deeded to Ferrotech. Instead of the property being deeded to Ferrotech, the complaint alleges that the property was fraudulently deeded to Ferrotech Realty for the purpose of depriving Barletto of his property rights. The claims that arise out of this transaction are directly related to the actions Heuschkel allegedly took as the agent of the signatory. Just as the plaintiffs in *Pritzker* were basing liability against MLAM for actions taken on behalf of their sister corporation, Barletto is claiming knowing participation by Ferrotech Realty in the fraudulent refinancing done on behalf of Ferrotech. The claims for fraud and rescission against Ferrotech Realty are directly related to transactions arising out of the APA and thus are subject to the arbitration clause. This is an instance, much like in *Pritzker*, where the parties have unmistakably agreed to arbitrate any and all controversies which might arise between them, and as such the agents and related corporate entities of the parties have the right to enforce the arbitration clause for any such controversies.

Another similar situation in which a sister corporation was bound by an arbitration clause is found in the case of

*Ketchum v. Almahurt Bloodstock IV,* 685 F. supp. 786 (D. Kan. 1988).

The district court in *Ketchum* had to decide whether an affiliate corporation was bound by an arbitration clause entered into by a corporate sister. Without basing its decision on the affiliate status of the corporation, the court held that the sister corporation was bound by the arbitration clause. The court rested its decision on four specific circumstances present in the case. First, the affiliate corporation agreed to be bound by the arbitration clause as evidenced by its motion to compel arbitration. *Id.* at 793. Second, the claims against the affiliate corporation were identical to the claims against the signatory corporation. *Id.* Third, the plaintiff's claims against both defendants arose out of the same transactions. *Id.* at 794. Finally, the claims against both defendants fell within the broad language of the arbitration clauses. The district court concluded that based on the four described circumstances it was reasonable for the non-signatory corporate affiliate to be bound by the arbitration clause. *Id.* at 794.

The four circumstances the district court relied upon to find it reasonable for a non-signatory corporate affiliate to compel arbitration are also present in the case sub judice. First, Ferrotech Realty has agreed to be bound by the arbitration clause based on its motion to compel arbitration. Second, the claims Barletto has against Ferrotech Realty are identical to the claims against Heuschkel, who was acting on behalf of and as the agent of Ferrotech when the alleged fraud was committed. Third, the two claims filed against both Ferrotech Realty and Heuschkel arise

out of the same transaction. And finally, the claims against Ferrotech Realty are within the ambit of the broadly construed arbitration clause. As was the case in *Ketchum*, based on the above stated circumstances, it is reasonable for Ferrotech Realty to compel Barletto to arbitrate the two claims filed against the entity.

The court's attention must next turn to the question of whether Ferromet, as the parent company of Ferrotech, may enforce the arbitration clause in the claims filed against it. In the case of *Dodds v. Pulte Home Corporation*, 909 A.2d 348 (Pa. Super. 2006), the Pennsylvania Superior Court held that a non-signatory parent company could enforce an arbitration clause to which its subsidiary was a signatory. *Dodds* at 352. In *Dodds*, the plaintiffs sought to avoid the arbitration agreement they entered into with the Pulte Home Corporation of the Delaware Valley (PHCDV) by including the parent of PHCDV, Pulte Home Corporation (PHC), who was a non-signatory to the agreement, in their claim. *Id.* at 348.

The plaintiffs in *Dodds* argued that because a fraud claim was asserted against the non-signatory PHC, the alleged parent of PHCDV, the claim was no longer in the ambit of the arbitration agreement. *Id.* at 351. The defendants argued that non-signatories to an arbitration agreement are able to enforce the agreement when an obvious and close nexus between the non-signatories and the contract or contracting parties is found. The Superior Court agreed with the defendants. *Id.*

The Superior Court started its analysis of the issue by citing instances in which the court had found that non-

signatories to a contract have fallen within the scope of the arbitration clause found in the contract. In the cases of *Smay v. E.R. Stuebner, Inc.,* 864 A.2d 1266 (Pa. Super. 2004) and *Highmark Inc. v. Hospital Service Ass'n,* 785 A.2d 93 (Pa. Super. 2001), the Superior Court found that non-signatory third party beneficiaries could fall within the scope of an arbitration clause if that was the signing parties' intent. *Dodds* at 351. The court examined the interests of the parties in *Smay* and found that the claims from the signatory and the claims from the non-signatory were indistinguishable, arose from the same incident and implicated identical legal principles. Because of the close and obvious nexus between the claims, the non-signatory's claim was subject to the arbitration agreement. *Dodds* at 352.

The Superior Court extended the rationale in *Smay* to find that claims against PHC fell within the ambit of the arbitration clause signed by the Dodds and PHCDV. *Dodds* at 352. The Superior Court found that the interests of PHC and PHCDV were identical and that the arbitration agreement was enforceable by the non-signatory parent. Specifically the court held that:

> An arbitration agreement would be of little value if a party could obviate the effect of the agreement merely by finding a way to join another party. In no event could the arbitration clause of PHCDV be defeated by adding PHC to the complaint, and because PHC wishes to enforce the arbitration agreement rather than avoid it, plaintiffs, as signatories to the arbitration agreement, should not be able to avoid the requirement to arbitrate

by a non-signatory when the non-signatory wants to arbitrate. *Dodds* at 352.

The holding in *Dodds* thus blocks signatories to an arbitration agreement from attempting to avoid their bargained for contractual obligation by joining a non-signatory parent who shares interests that are obviously and closely related to the interests of a signatory subsidiary. This is especially the case when the non-signatory parent company wishes to enforce the arbitration agreement the signatory party is attempting to avoid. *Dodds* at 352.

When the rationale of the Superior Court in *Dodds* is applied to the case sub judice, the attempts by plaintiff Barletto to block enforcement of the arbitration clause must fail. Examining the interests of signatory defendant Ferrotech with the interests of the non-signatory defendants Ferromet, Heuschkel, and Ferrotech Realty it is clear that an obvious and close nexus exists among the interests of all defendants. Ferrotech is a subsidiary of Ferromet, Ferrotech Realty is a sister-corporation to Ferrotech, and Heuschkel, who as president and owner of all three corporations, was the agent through which the corporate entities functioned. The claims filed by plaintiff Barletto all arise as a result of actions Heuschkel took on behalf of the corporate entities, and therefore the interests of the defendants are indistinguishable. As the Superior Court stated in *Dodds*, an arbitration agreement has little value if it can be avoided simply by adding another party to an action. *Dodds* at 352. This is especially true in the instant action where plaintiff has attempted to avoid the bargained for arbitration agreement by filing claims arising directly out of the APA against non-signatory parties closely related

to the signatory, whose interests are indistinguishable from the signatory and those who wish to arbitrate.

Even if the court were to assume arguendo that the above mentioned theories do not compel Barletto to resolve his claims in arbitration, the theory of equitable estoppel compels that Barletto does so. The theory has been adopted by several courts of appeal as an appropriate method by which non-signatories to arbitration agreements may compel signatories to arbitrate their claims. See *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757-58 (11th Cir. 1993), cert. denied, 513 U.S. 869, 115 S.ct. 190, 130 L. Ed 2d 123 (1994); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320-321 (4th Cir. 1988); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, 741 F.2d 342, 344 (11th Cir. 1984); *Thomson-CSF, S.A. v. American Arbitration Association,* 64 F.3d 773 779-780 (2nd Cir. 1995); *Hughes Masonry Co. v. Greater Clark County School Bldg. Corp.*, 659 F.2d 836, 838-839 (7th Cir. 1981). In these cases, the courts identified three factors that compelled a signatory to an arbitration agreement to arbitrate with a non-signatory at the non-signatory's insistence. Signatories were bound to arbitrate because of (1) the close relationship between the entities involved in the disputes; (2) the relationship of the alleged wrongs to the non-signatory's obligations and duties found in the contract; and (3) because the claims involved in the disputes were intimately founded in and intertwined with underlying contractual obligations. *Thomson-CSF*, 64 F.3d at 779 (quoting *Sunkist*, 10 F.3d at 757).

Of the three factors, the third factor, whether the claims

are intimately founded in and intertwined with underlying contractual obligations, is the most important. *Sunkist*, 10 F.3d at 757-758. At issue in *Sunkist* was a license agreement that contained an arbitration clause. The non-signatory to the agreement, Del Monte, was attempting to compel *Sunkist* to arbitrate the claims between them. *Sunkist* claimed that it could not be equitably estopped from avoiding arbitration because no references to duties or obligations of del monte were present in the license agreement. *Id.* at 757. The eleventh circuit court of appeals disagreed. *Id.* at 758.

The court began its analysis by discussing case law across the circuits where the theory of equitable estoppel was used to compel a signatory to arbitrate with a non-signatory. *Id.* at 757. In those cases, the courts relied on the close relationship between the entities involved in the dispute and on the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract to determine that the claims were "intimately founded in and intertwined with the underlying contractual obligations." *Sunkist*, 10 F.3d at 757 (quoting *McBro Planning*, 741 F.2d at 344). *Sunkist* hinged its arguments against the imposition of equitable estoppel on the absence of any mention of Del Monte in the licensing agreement. The eleventh circuit held that this reliance was legally insufficient. *Id.* at 757.

In distilling the rationale behind the decisions that used equitable estoppel to bind a signatory, the eleventh circuit discovered that the crucial and dispositve factor in those holdings was not the inclusion of the non-signatories in the contracts at issue. Rather, the crucial factor in each case was "the foundation that ultimately, each party must rely

on the terms of the written agreement in asserting their claims." *Sunkist* at 757. The references in the contracts to non-signatories added support to the conclusion that the claims were "intimately founded in and intertwined with the underlying contract obligation," but the references alone were not a deciding factor. *Id.* The deciding factor for the court in *Sunkist* was the degree to which the claims arose out of the obligations and duties contained in the contract at the heart of the dispute. *Id.*

To add support to its position, the eleventh circuit discussed the case of *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir. 1988). The holding in *J.J. Ryan* allowed a parent company to arbitrate claims based on a contract entered into by its subsidiary. The court did so based on the fact that the claims against both the parent and subsidiary arose from the same facts and were inherently inseparable. The fourth circuit cited the eleventh circuit's use of equitable estoppel in *McBro* as a justification for its holding. The eleventh circuit then used the holding of the fourth circuit in *J.J. Ryan* to more fully develop the theory of equitable estoppel as it relates to the binding of signatories to an arbitration agreement at the insistence of non-signatories.

Using the holding in *J.J. Ryan*, the eleventh circuit in *Sunkist* determined that for equitable estoppel to be applicable, an examination of the nature of the claims being asserted must be conducted to determine if the claims fall within the scope of the agreement and therefore compel the signatory to arbitrate. *Sunkist* at 758. The *Sunkist* court stated:

Therefore, the focus of our inquiry should be on the nature of the underlying claims asserted by *Sunkist* against Del Monte to determine whether those claims fall within the scope of the arbitration clause contained in the license agreement. *Id.*

The court examined the claims filed by *Sunkist* and found that all of them made reference to the license agreement to which Del Monte was not a signatory. *Id.* The claims did not rely exclusively on the license agreement, but the court found that each claim at least presumed the existence of such an agreement. Each claim arose out of and was directly related to the agreement, and therefore a sufficient nexus between the claims and the agreement existed such that *Sunkist* could be equitably estopped from avoiding arbitration of its claims. *Id.* at 758.

To determine if Barletto can be equitably estopped from avoiding arbitration of his claims, those claims must be examined to determine if a sufficient nexus exists between the claims and the APA. As has already been established, each claim does arise out of and relate to the terms of the APA. Count one is for breach of the APA. Count two is for breach of fiduciary duties that arose out of the APA. In count three, Barletto is suing for oppression of a minority shareholder. Barletto's alleged position as a minority shareholder arises directly out of the duties and obligations found in the APA. Count four of the complaint alleges fraud regarding the percentage of profits

Barletto was entitled to receive under the APA and where said profits were actually distributed. Count five is tied to count four, and asks for an accounting of the profits

that have been earned as a result of Barletto entering into the APA. Counts six and seven are tied to the refinancing of the property leased to Ferrotech via the APA, and the alleged fraud associated with the refinancing.

The two final counts of Barletto's complaint are for defamation/trade libel and for intentional interference with contractual relationships. It is well established in Pennsylvania that when parties to a contract have included a broad arbitration clause in an agreement, disputes arising out of the contractual relationship must, when requested, be arbitrated. *Foster v. Philadelphia Manufacturers*, 592 A.2d 131, 133 (Pa. Commw. Ct. 1991). Doubts as to whether an arbitration clause covers a particular dispute should be resolved in favor of arbitration. *McNulty v. H&R Block, Inc.*, 843 A.2d 1267, 1271 (Pa. Super. 2004). In *J.J. Ryan*, three of the counts at issue were for libel, defamation, and injurious falsehood. The counts centered around the malicious sending of untrue notices by the defendant to business associates of the plaintiff informing them that the plaintiff had defaulted on security agreements. The court concluded that the dispute over the security agreements arose in connection with the contract and therefore all the claims regarding the security agreement disputes could be referred to arbitration. *J.J. Ryan*, 863 F.2d at 320.

As was the case in *J.J. Ryan*, the alleged defamation/ trade libel and intentional interference with contractual relationship claims brought by Barletto can be resolved in arbitration. The arbitration clause contained in the APA is broadly worded and covers "any and all disputes, controversies or claims arising out of or relating to this agreement or for the breach or validity of any term or

provision of this agreement." As has been previously discussed, these claims originate out of the allegedly wrongful breaches of the APA by defendant Heuschkel. Plaintiff, in his complaint, admits that because of the alleged breaches of the APA he was forced to start a new business and since then defendant Heuschkel has "engaged in a campaign of defamation and trade libel," the purpose of which is to drive Barletto out of business. The defamatory statements allegedly made by Heuschkel arose out of the disintegration of the relationship formed between the two parties through the APA and thus stem from the dispute between the parties regarding the duties and obligations contained within the agreement. Therefore these counts also arise out of or relate back to the agreement. Barletto is estopped from avoiding arbitration of these claims.

Having established that a valid arbitration agreement exists between all of the parties, the court's final task is to determine whether all of the alleged claims against the defendants are within the ambit of the arbitration clause. Based on the foregoing analysis of the theory of equitable estoppel, and the previous discussion of plaintiff's claims, the court finds that each of the nine counts in the complaint arise directly out of or relate back to the duties and obligations contained within the APA or for the breach of said duties and obligations and therefore may be compelled to arbitration.

In conclusion, plaintiff Charles Barletto must arbitrate his claims against defendants Heuschkel, Ferrotech, Ferromet, and Ferrotech Realty. Traditional contract theories of agency and estoppel compel Barletto, a signatory to the agreement, to arbitrate at the insistence

of non-signatory defendants who are the agents or affiliates of the signatory to the agreement when the claims and positions of all parties are intimately founded on and intertwined with the underlying contractual obligations found in the APA. "In short, plaintiff cannot have it both ways. It cannot rely on the contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Hughes Masonry*, 659 F.2d at 839. Barletto bargained for the provision found in the APA, and relies on those same provisions in his claims against the defendants. He cannot now avoid his contractual obligations by repudiating the portions of the contract that are not in his favor. Defendant's preliminary objections are sustained and plaintiff's claim is dismissed so that it may be filed within the proper venue.

## ORDER OF COURT

And now, February 7, 2011 in accordance with the accompanying opinion of even date herewith, it is ordered and decreed as follows:

1. Defendant's first preliminary objection raising lack of subject matter jurisdiction pursuant to Pa.R.C.P. § 1028(a)(6) and the Pennsylvania Uniform Arbitration Act is granted.

2. The parties are directed to submit their dispute, as set forth in the complaint, to arbitration in accordance with the commercial arbitration rules of the American Arbitration Association.

3. All further proceedings in this matter are stayed pending the conclusion of arbitration.

4. All remaining preliminary objections are overruled as rendered moot by this order.