J-A13002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DAKOTA OIL PROCESSING, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHRISTOPHER G. HAYES, ESQUIRE INDIVIDUALLY, THE LAW OFFICES OF CHRISTOPHER G. HAYES, JEFFREY L. HARDIN, ESQUIRE INDIVIDUALLY, AND LOCKE LORD LLP | : | No. 1493 EDA 2020 |
| | : | |
| APPEAL OF: CHRISTOPHER G. HAYES, ESQUIRE INDIVIDUALLY, THE LAW OFFICES OF CHRISTOPHER G. HAYES | : | |

Appeal from the Order Entered June 26, 2020
In the Court of Common Pleas of Chester County Civil Division at No(s):
No. 2018-10444-CT

BEFORE:   BENDER, P.J.E., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                     **FILED JULY 19, 2021**

Appellants, Christopher G. Hayes, Esquire, Individually ("Hayes"), and The Law Offices of Christopher G. Hayes (collectively "Appellants"), appeal from the trial court's June 26, 2020 order, which, *inter alia*, overruled their preliminary objection to Appellee's, Dakota Oil Processing, LLC ("Dakota"), amended complaint in the nature of a petition to compel arbitration. We affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

The trial court summarized the facts underlying this case as follows:

This action arises out of Dakota's loss of a $2.5 million escrow payment. The facts of the case, as gleaned from the amended complaint, are as follows: Dakota is a limited liability company formed in the state of North Dakota with a principal place of business located in Manasquan, New Jersey. Dakota was formed for the purpose of developing, constructing, and operating a "crude oil topping refinery" near the unincorporated community of Trenton, North Dakota. In August of 2016[,] Dakota entered into an escrow agreement with a venture financing firm based out of Bermuda known as Cal & Schwartz. Pursuant to that agreement, Cal & Schwartz agreed to procure a $500 million standby letter of credit ("SLOC") on Dakota's behalf in exchange for Dakota's payment of $2.5 million. The agreement required Dakota to deposit its payment into an escrow account pending issuance of the SLOC. Ultimately, Dakota intended for a third-party to utilize the SLOC as collateral to lend it funds to develop the refinery.

The agreement initially identified the law office of Emile Barton, a New York attorney, as the parties' escrow agent. However, "[o]n or around August 18, 2016, [Cal & Schwartz] informed Dakota that it required [Hayes] to replace Attorney Barton as escrow agent in order to proceed with the [l]oan." Dakota retained Locke Lord, LLP, a law firm headquartered in Dallas, Texas, "to negotiate the terms of [a revised] escrow arrangement with Attorney Hayes, among other things." Jeffry L. Hardin ("Hardin"), an attorney in Locke Lord's Washington[,] D.C. office, represented Dakota in the transaction.

[Hayes] is an attorney licensed to practice law in Pennsylvania. His business, The Law Office of Christopher G. Hayes, "is a professional corporation engaged in the practice of law, with offices located" in West Chester, Chester County. Between September 14 and September 28, 2016, Dakota, through Hardin, communicated with Hayes regarding his role in the escrow transaction, "as well as the terms of the [e]scrow [a]greement and the authentication process required to ensure that Dakota received [] funding under the [SLOC] prior to the release" of its escrow payment. One issue addressed by the parties was whether Hayes could hold Dakota's escrow payment in his Pennsylvania IOLTA trust account in accordance with the Pennsylvania Rules of

Professional Conduct.[1]  In addition, the parties sought to determine whether Hayes would be covered by his professional liability insurance while in the course of providing escrow services for Dakota and Cal & Schwartz.  On September 28, 2016, Hayes sent Hardin an email authorizing him to speak with Hayes'[s] insurance broker regarding the scope of Hayes'[s] insurance coverage, and further stated:

> After deeper investigation on my end of an IOLTA account, it is my understanding that (a) the use of an IOLTA account for the escrow funds under these circumstances is appropriate and well-defined within the rules and (2) [*sic*] it is my obligation, under those rules, to hold such funds in an IOLTA account.

> Hardin responded [to] Hayes's email the same day by stating that he had spoken with Hayes'[s] insurance broker and that the latter would be calling Hayes "to explain the need for you to be performing legal services in order to be covered by your insurance."  Hardin further advised Hayes: "[Y]our IOLTA account also contemplates an attorney-client relationship.  I would like to

---

[1] "IOLTA" stands for "Interest On Lawyer Trust Account."  R.P.C. 1.15(a)(5).  "An IOLTA Account is an income producing Trust Account from which funds may be withdrawn upon request as soon as permitted by law.  Qualified Funds are to be held or deposited in an IOLTA Account."  ***Id.***  "Qualified Funds" are defined as "Rule 1.15 Funds which are nominal in amount or are reasonably expected to be held for such a short period of time that sufficient income will not be generated to justify the expense of administering a segregated account."  R.P.C. 1.15(a)(9).  "Rule 1.15 Funds" are:

> [F]unds which the lawyer receives from a client or third person in connection with a client-lawyer relationship, or as an escrow agent, settlement agent or representative payee, or as a Fiduciary, or receives as an agent, having been designated as such by a client or having been so selected as a result of a client-lawyer relationship or the lawyer's status as such.  When the term "property" appears with "Rule 1.15 Funds," it means property of a client or third person which the lawyer receives in any of the foregoing capacities.

R.P.C. 1.15(a)(10).

discuss with you the possibility of [Dakota] engaging you as its attorney."

During their communications, Hardin and Hayes also addressed "the precise mechanism for confirming Dakota's receipt of funds" prior to the release of its escrow payment. By separate email also dated September 28, 2016, Hardin explained to Hayes that Dakota's bank "will send an email to you indicating that the funds have been received" by Dakota pursuant to the SLOC, and "there will be a phone number and person at [Dakota's bank] that you will need to call to authenticate the email and make the confirmation valid."

Dakota and Cal & Schwartz executed a revised escrow agreement on September 13 and September 26, 2016, respectively. On September 28, 2016, Hayes also executed the agreement.[2] While the agreement formally identifies Hayes as the parties' "Escrow Manager," Hayes personally signed the document with the self-designated title "Escrow Attorney." The following day[,] Hayes sent Hardin a confirmatory email stating: "To confirm, as per the agreement, I am acting as the escrow attorney for the signed parties."

> [2] The revised escrow agreement between Dakota, Cal & Schwartz, and Hayes is formally titled "Transaction Agreement."

The revised escrow agreement sought to ensure that Dakota received at least $5 million in initial funding under the SLOC prior to Hayes'[s] release of Dakota's escrow payment to Cal & Schwartz. The agreement provides in relevant part:

> Only upon the issuance of a confirmation of receipt by [Dakota's] Bank of [$5 million in initial funding under the loan agreement] and receipt by [Hayes] of such confirmation (such confirmation shall be sent by [Dakota's] Bank to [Hayes] and copied to [Dakota] and [Cal & Schwartz]), [Hayes] shall immediately issue disbursement instructions to [his bank] to pay [Cal & Schwartz] on behalf of [Dakota] the sum of [$2.5 million] from [Hayes's] [e]scrow [d]eposit [a]ccount.

On September 30, 2016, Dakota funded the escrow payment by depositing $2.5 million into Hayes'[s] IOLTA account. On November 2, 2016, a representative of Dakota contacted Hardin in order to validate "that the [escrow] funds remain in the

account."  However, the following day, "Dakota discovered that Attorney Hayes had released the [e]scrow [p]ayment without authorization, and without confirmation that Dakota had received any funding under the [SLOC]."  Dakota alleges that it lost its entire escrow payment as a consequence, and never received any funding under the SLOC.

Trial Court Opinion ("TCO I"), 6/26/20, at 1-4 (some brackets added; internal citations omitted).

The trial court described the subsequent litigation of this matter as follows:

Dakota instituted this action by writ of summons on October 15, 2018, naming Hayes and his law firm, "The Law Office of Christopher G. Hayes," as [d]efendants.[4]  On January 2, 2019, Dakota filed an amended complaint asserting claims for professional negligence, breach of contract, and breach of fiduciary duty.  [Appellants] filed preliminary objections on January 22, 2019, asserting (among other objections) that Dakota's amended complaint must be dismissed because the [revised] escrow agreement contains [an] arbitration provision.[2] Dakota filed a response in opposition on February 11, 2019, and both parties contemporaneously filed supporting memorand[a] of law.  [Appellants] also filed a "reply brief" in further support of their preliminary objections on April 22, 2019.

> [4] In addition to Hayes and his law firm, Dakota also named … Hardin … and Locke Lord … as [d]efendants.  However, by order entered April 16, 2020, the [c]ourt dismissed Hardin and Locke Lord from this action for lack of personal jurisdiction.  Dakota did not appeal that order.

On June 26, 2020, the [c]ourt entered an order sustaining in part, overruling in part, and dismissing in part[ Appellants'] preliminary objections to Dakota's amended complaint.  In the memorandum opinion attached to the order, the [c]ourt identified a threshold dispute arising from the parties' arguments, namely, whether

---

[2] The revised escrow agreement's arbitration provision states, in relevant part, that "[i]n the event of any disputes, all Parties hereto agree to be bound by the International Chamber of Commerce (ICC), Rules of Arbitration…."  **See** Amended Complaint, 1/2/19, Exhibit F at ¶ 18 ("Revised Escrow Agreement").

Dakota's claims against [Appellants] were predicated on a theory of "escrow agent liability" arising out of Hayes'[s] role as escrow agent in the financial transaction between Dakota and Cal & Schwartz, or, alternatively, legal malpractice and breach of fiduciary duty based on either an express or implied attorney-client relationship between Dakota and Hayes. The [c]ourt examined this issue by considering the different roles, duties, and fiduciary obligations of an escrow agent and attorney, and determined … that, based on the allegations of the amended complaint, Dakota had plausibly alleged the existence of an implied attorney-client relationship between itself and Hayes, notwithstanding the fact that Hayes was *also* Dakota's escrow agent under the terms of the [revised] escrow agreement. In addition, the [c]ourt overruled [Appellants'] preliminary objection in the nature of a petition to compel arbitration, concluding the nature of the parties' dispute fell outside the scope of the arbitration provision.

On July 27, 2020, [Appellants] filed a timely notice of appeal of the [c]ourt's order. On July 28, 2020, the [c]ourt ordered [Appellants] to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). [Appellants] filed a [Rule] 1925(b) statement on August 14, 2020….

Trial Court Opinion ("TCO II"), 9/9/20, at 2-4 (internal citation and footnote omitted; emphasis in original).

Appellants raise a single question for our review:

Whether the trial court's decision to overrule a preliminary objection to compel arbitration lacked substantial evidence and was an abuse of discretion where the language of the arbitration provision was clear and contained no limitation on the scope of disputes subject to arbitration, but the trial court did enforce [*sic*] the provision as written, imposed scope limitations not contained in [the] arbitration provision, and based its decision on an implied attorney-client relationship not alleged in the amended complaint?

Appellants' Brief at 3.

Initially, we observe that, "[a]s a general rule, an order denying a party's preliminary objections is interlocutory and, thus, not appealable as of

right." ***Shadduck v. Christopher J. Kaclik, Inc.***, 713 A.2d 635, 636 (Pa. Super. 1998) (citation omitted). "There exists, however, a narrow exception to this oft-stated rule for cases in which the appeal is taken from an order denying a petition to compel arbitration." ***Id.*** (citations omitted). We will therefore review the trial court's decision to overrule Appellants' preliminary objection to compel arbitration.

In doing so, we remain mindful that:

> We review a trial court's denial of a motion to compel arbitration for an abuse of discretion and to determine whether the trial court's findings are supported by substantial evidence. In doing so, we employ a two-part test to determine whether the trial court should have compelled arbitration. The first determination is whether a valid agreement to arbitrate exists. The second determination is whether the dispute is within the scope of the agreement.
>
> Whether a claim is within the scope of an arbitration provision is a matter of contract, and as with all questions of law, our review of the trial court's conclusion is plenary. The scope of arbitration is determined by the intention of the parties as ascertained in accordance with the rules governing contracts generally. These are questions of law and our review is plenary.
>
> Arbitration is a matter of contract, and parties to a contract cannot be compelled to arbitrate a given issue absent an agreement between them to arbitrate that issue. Even though it is now the policy of the law to favor settlement of disputes by arbitration and to promote the swift and orderly disposition of claims, arbitration agreements are to be strictly construed and such agreements should not be extended by implication.

***Elwyn v. DeLuca***, 48 A.3d 457, 461 (Pa. Super. 2012) (internal citations and quotation marks omitted).

Here, the parties do not dispute that a valid agreement to arbitrate exists. They only contest whether Dakota's legal malpractice claims against Appellants fall within the scope of the arbitration provision in the revised escrow agreement. Appellants argue that the at-issue arbitration provision is "broadly worded[,]" in that it provides, in pertinent part, that "[i]n the event of *any disputes*, all Parties hereto agree to be bound by the International Chamber of Commerce (ICC), Rules of Arbitration…." Appellants' Brief at 20 (citation omitted; emphasis in original). They say that the arbitration provision "contains no scope limitation[,]" and that "[t]here is no limitation in the provision as to the nature of the disputes subject to arbitration." ***Id.***

> In rejecting this argument, the trial court explained:

> The revised escrow agreement states in relevant part: "*In the event of any disputes, all Parties hereto agree to be bound by the International Chamber of Commerce (ICC), Rules of Arbitration*[.]" The [c]ourt interprets this language in light of the contractual obligations the parties agreed to be bound by in the agreement. ***See, e.g.***, ***Com. ex rel. Kane v. UPMC***, 129 A.3d 441, 463-64 (Pa. 2015) ([stating a] contract "should be read as a whole to give effect to its true purpose[]") (cleaned up). Here, the agreement required Hayes to perform escrow services for Dakota and Cal & Schwartz — that is, he was to hold Dakota's escrow payment in his Pennsylvania IO[LT]A trust account until the occurrence of a specified event, whereupon he would release the payment to Cal & S[ch]wartz. Accordingly, the terms of the parties' contract evinces an intent to submit a dispute to arbitration if the dispute bears some relation to Hayes'[s] provision of escrow services for Dakota or Cal & Schwartz.

> In this case, Dakota has not sued Hayes on a theory of escrow-agent liability. Instead, it asserts claims for legal malpractice and breach of fiduciary duty based on a separate implied attorney-client [relationship] in which Hayes provided legal services to Dakota in connection with the escrow transaction. A review of Dakota's claims against [Appellants] confirms this: None of its

claims are based on Hayes'[s] failure [to] provide escrow services in accordance with the terms of the revised escrow agreement. To the contrary, they are premised upon Hayes'[s] alleged failure [to] provide legal services which would ensure that Dakota's escrow payment remained protected by the escrow agent (whom, in this case, happens to also be Hayes). Accordingly, the [c]ourt finds that Dakota's claims against [Appellants] is not the type of dispute that falls within the scope of the agreement — the terms of which relate entirely to the provision of escrow services, not legal services.

TCO I at 18-19 (internal citation omitted; emphasis in original); **see also** TCO II at 8 ("Dakota's dispute fell outside the scope of the arbitration provision because Dakota did not seek relief against Hayes for his role as escrow agent in the financial transaction between Dakota and Cal & Schwartz — the very subject matter of the escrow agreement — but rather for legal services predicated on an attorney-client relationship between itself and Hayes."); **id.** ("While the language of the arbitration provision is broad — encompassing 'any disputes' between the parties — it is necessarily limited by the subject matter of the agreement, and therefore only extends to claims against Hayes which are predicated on his role as 'escrow agent' for Dakota and Cal & Schwartz under the escrow agreement, not to claims based on his role as attorney for Dakota in connection with the escrow agreement.") (citation and footnote omitted).

Through this analysis, Appellants aver that "the trial court imposed a scope limitation that does not exist in the arbitration provision — that the dispute must be related to Hayes'[s] provision of escrow services to Dakota or [Cal & Schwartz] to be within the scope of the arbitration provision[,] and

was not because the trial court determined there was an implied-attorney client relationship between Hayes and Dakota and the dispute concerned Hayes'[s] provision of legal services to Dakota." Appellants' Brief at 16. Appellants say that "[t]here was not substantial evidence to support the scope limitation imposed by the trial court and its failure to enforce the intent of the parties as determined from the clear and unambiguous language of the arbitration provision was an abuse of discretion." *Id.* They maintain that "[t]he claims in the amended complaint are between the parties to the [r]evised [e]scrow [a]greement, Hayes and Dakota. For that reason, the dispute is within the unlimited arbitration provision of the [r]evised [e]scrow [a]greement." *Id.* at 21 (citation omitted).

No relief is due. We have previously explained that, in reviewing an arbitration agreement,

> [t]he court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement. The court will adopt an interpretation that is most reasonable and probable bearing in mind the objects which the parties intended to accomplish through the agreement.
>
> If it appears that a dispute relates to a contract's subject matter and the parties agreed to arbitrate, all issues of interpretation and procedure are for the arbitrators to resolve.

*Provenzano v. Ohio Valley General Hosp.*, 121 A.3d 1085, 1095 (Pa. Super. 2015) (internal citations and quotation marks omitted).

Here, as the trial court observed, Dakota's legal malpractice claims are distinct from the subject matter of the revised escrow agreement, which set

forth the way in which Dakota would make its escrow deposit, Cal & Schwartz would transmit the funding, and Hayes would hold and release Dakota's escrow deposit. Dakota did not sue Appellants based on Hayes's performance in holding and releasing its escrow deposit, rather it sued Appellants based on the allegedly deficient legal advice Hayes rendered to it as its attorney with respect to advising it on how the escrow transaction should be arranged. Appellants point us to nothing in the revised escrow agreement that addresses, or contemplates, this attorney-client relationship between Dakota and Hayes in connection with the escrow transaction. As Dakota persuasively observes,

> [t]he arbitration provision purports to apply to "any disputes" between the "Parties." "Parties" is a defined term in the [revised e]scrow [a]greement that specifically includes the "Client," Dakota; the "Escrow Manager," Hayes; and the "Provider," Cal & Schwartz. In other words, the arbitration provision applies only to disputes between "the Client, the Escrow Manager, and the Provider" to the Escrow Agreement, and thus "is necessarily limited by the subject matter of the agreement." Finally, the restrictive definition of "Parties" limits the scope of the provision notwithstanding its purported application to "any" disputes, because "where specific or exact terms seem to conflict with broader or more general terms, the former is more likely to express the meaning of the parties with respect to the situation than the general language."

Dakota's Brief at 26-27 (internal citations omitted).[3] Based on the foregoing, we agree with the trial court and Dakota that Dakota's legal malpractice claims

---

[3] In light of the wording of the revised escrow agreement's arbitration provision, we deem **_Borough of Ambridge Water v. Columbia_**, 328 A.2d 498 (Pa. 1974), relied on by Appellants, to be distinguishable. As the trial
*(Footnote Continued Next Page)*

fall outside of the scope of the revised escrow agreement's arbitration provision, as those claims do not pertain to Hayes's performance as the escrow manager, but rather to his performance as Dakota's attorney.

Finally, to the extent Appellants complain that "[t]he allegations of the amended complaint do not establish the existence of an implied attorney-client relationship between Dakota and Hayes[,]" **see** Appellants' Brief at 23, such arguments are not ripe for our review and we will not address them. **See Shadduck**, 713 A.2d at 636-37 ("We will, therefore, review the merits of that portion of the court's order denying [the appellant's] motion to compel arbitration. We note, however, that [the appellant's] objections in the form of general demurrers to the tort counts in the underlying complaint are not ripe for this Court's review. Our discussion will, therefore, be limited to the

_____

court noted, the arbitration provision in **Borough of Ambridge Water** contained different language than the arbitration provision at issue here. **See Borough of Ambridge Water**, 328 A.2d at 499 (the arbitration provision's stating that "any controversy or claim arising out of or relating to this Agreement or breach thereof shall be settled by arbitration…"); TCO II at 8 n.9 ("An arbitration provision which applies to any controversy or dispute 'arising out of or relating to' an agreement has generally been held to apply to any type of claim of a complaining party, whether sounding in contract or tort, that relates to the parties['] contractual relationship. Notably, such language was not used in the arbitration provision at issue here.") (citation omitted). Further, in **Borough of Ambridge Water**, the Court noted that "the controversy centers around [the] appellee's claims for pay due him under [his employment] contract upon termination of his employment. It cannot be seriously questioned that a dispute of this nature was intended to fall within the provisions of paragraph 17 [(*i.e.*, the arbitration provision of his employment contract)]…." **Id.** at 502. Here, in contrast, it is not evident that the parties intended for Dakota's legal malpractice claims to fall within the arbitration provision of the revised escrow agreement, as that agreement did not address any legal assistance received by Dakota from Appellants.

arbitration issue.") (citation omitted). As Appellants have not demonstrated that the trial court erred in overruling their preliminary objection in the nature of a petition to compel arbitration, we affirm.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/19/2021